Case number 14-5157, People for the Ethical Treatment of Animals, Appellants v. United States Department of Agriculture, and Thomas J. Vilsack, in his official capacity as Secretary of the United States Department of Agriculture. Mr. Struger for the Appellants, Mr. Haffman for the Appellees. May it please the Court, Matthew Struger for the Plaintiff Appellants in this matter. I'd like to reserve two minutes for rebuttal. Your Honors, the USDA's refusal to apply the Animal Welfare Act to birds is judicially reviewable and at the very least requires the production of the administrative record in this case. The District Court's ruling granting the government's 12B6 motion is in error for at least four separate reasons. First, the Animal Welfare Act provides a substantive framework for the agency to apply, taking this case out of the bill. I just want to be clear, I'm sorry to interrupt you, but I want to be clear on what we still have on appeal. So, am I right that you're not appealing the judge's decision with respect to the failure or delay in issuing bird-specific regulations? That is correct, Your Honor. Claim 2 is not appealed in this case. So the only issue is failure to enforce general regulations? Well, it's the failure to apply the Act in any way. Okay. The statute does not, when Congress included Birds in the Animal Welfare Act explicitly in 2002. But you're not encompassing within that any failure to issue a regulation specifically with respect to birds? That's correct. The regulation, the framework is there, Your Honor. There's basically... This is entirely a non-enforcement claim, a failure to enforce. No, it's a failure to apply the Act in any way. I think there are three. What's the difference between a failure to enforce the law and a failure to apply the Act in any way? Well, it's not like this Court's single-shot enforcement decisions like Crowley or the other cases where they're petitioning for an enforcement in a particular action. I understand, but they're not enforcing the law in any way, is your point? They're not enforcing the law in the sense that they are not inspecting regulated entities, and they are not issuing citations, and they're just claiming birds are outside their jurisdiction, are currently not regulated. But they're also not licensing facilities. And the Act, Section 2133, requires the agency to issue licenses. Issue licenses when somebody applies. Has anybody applied? Well, we don't have the administrative record. I think that's a merits question, Your Honor. We haven't been able to see if anyone's applied. We do have the agency declaring in their own policy guidance that one never needs a license to auction birds. Birds are listed in a category of never need a license. And our allegations are that the agency is informing exhibitors, dealers, that they do not currently need licenses despite Congress's inclusion of the birds. Do you mind addressing standing to start with? In particular, do you have a case in which this organizational standing construct has been extended to a claim that the government has failed to use your verb, you don't like my enforced verb, has failed to apply the law in any manner to a third party? Yes, Your Honor. I think this court's case in the Alliance of Senior Citizens of Greater Philadelphia versus Heckler, there the alliance represented senior citizens who had standing to sue the Department of Health and Human Services over regulations. No, see there the government had issued specific regulations that had sort of cut off and interfered with the way a prior general regulations had worked. That wasn't the agency not doing anything at all, that was the agency doing something that changed the landscape. Would you agree? Well, the agency issued regulations that plaintiffs believe, if enforced more in line with the statute, would have provided them the relief that they seek. It was the sort of under regulation there that harmed those plaintiffs. I thought the regulations there had changed the information flow to the plaintiffs. Well, sure, and the plaintiffs there believe that if they got the information that they sought, they wouldn't have to spend the additional money that they're doing on counseling and referral activities. It's analogous to our claim here that if the USDA carried out the inspections that it is required to carry out, it would issue the inspection reports that the agency generally issues after it carries out inspections. Is there anything in the statute that entitles individuals to information or obligates the government in any way to provide public information? I'm not sure whether the requirement of them issuing the inspection report is in the statute, Your Honor, or whether that's in the regulations or whether that's just a matter of agency practice. Does that not make a difference, then, to whether normally in informational injury cases, we always require a showing that the law creates a right to information in individuals? Well, like the Alliance of Senior Citizens case, this isn't simply an informational injury. This is that PETA typically carries out its mission. There's sort of this information, there's this mission issue, impairment of mission, and there's the diversion of resources issue. PETA's mission is to prevent cruelty to birds, and the way that this impairs PETA's mission is by cutting off some of that information that PETA would normally use. But also, it prevents PETA from not just getting that information, but following its normal practice of preventing cruelty to animals in exhibition. How do they prevent you from doing that? Well, they prevent us from doing that in the case of birds in that we should now submit complaints to the USDA, but you have no right to action on individual complaints or all of your complaints. You have no right to that. Excuse me? You have no right to. You would agree in the single-shot theory that you don't have a right to action on individual complaints or all of your complaints. They could say, rightly or unrightly, they could say no PETA complaints for action. Sure. I think that gets back to whether there's a policy or whether this is a single-shot enforcement here. Well, that's a merits issue. I'm still trying to get on standings. Sure. I'm still trying to understand how you're injured by the fact that they haven't acted on your complaints. Well, there are two issues. So there's the impairment of PETA's mission. I'm sorry, but I'm trying to very much understand how this isn't a direct impairment, what they're doing to you that impairs your mission. PETA has a mission to prevent cruelty to birds. It typically carries that out through issuing, through making complaints to the agency and from getting information from the agency. The injury comes in in the resource prompt, and there PETA has to spend money. It has to spend money to research state and local wildlife cruelty to animals issues and pursue relief that way, which causes, you know, if the agency was carrying out the act to birds, as to birds, PETA would not have to expend those resources. PETA has to send its own monitors to investigate allegations of animal cruelty, and PETA has to find other ways to obtain information about bird cruelty that would typically be provided in USDA complaints. So how would that distinguish all kinds of standing cases where someone could, where the Supreme Court has said no standing in Clapper, for example, and if they just said we are an organization devoted to opposing governmental monitoring and when it turns out, words out, that the NSA is doing X, Y, and Z, and that they're doing it for national security, we have to spend an awful lot of time saying that's not a good way of doing national security, you shouldn't do this, here are the things you should do to try to find out if the NSA is monitoring you, or don't call this person, and now we're going to have to, you know, maybe tell our folks you should talk in person rather than phone. Would they have gotten standing in Clapper in that way, if they just alleged it that way? Well, as I understand, Your Honor, the problem in Clapper was there was essentially five levels of attenuation where the plaintiffs did not know for sure that the statute was being applied to them. They took action based on a statute. So you're even further away because there's nothing being applied to you, and you want nothing applied to you, so you're even further removed from the folks in Clapper. They at least thought there was a chance they were being, not enough of a chance, but there's always a chance. You don't even have any chance of the government doing anything to you. Well, but there's plenty of cases, Your Honor, and I think that the Glickman decision is the discourse en banc decision in ALDF versus Glickman gets to this, it's not a resource injury diversion, but it's sort of this causation issue that I think Your Honor is getting at where the government's failure to regulate third parties that causes an injury to the plaintiff is sufficient. The Glickman case compiles something, you know, a handful, six, seven, eight Supreme Court cases where government's failure to regulate a third entity can cause sometimes aesthetic injury, sometimes environmental injury. No, but I thought your argument was one more removed. Yours is that the government's failure to regulate causes injury to birds. No, the government's... And then that requires you to do things in response to the injuries to birds. Well, it impairs PETA's mission to prevent cruelty to birds, and it requires PETA to continue with its mission to expend these resources on monitoring, researching state and local wildlife statutes, conducting investigations, going out to these facilities ourselves to see what we can do to carry out PETA's mission of preventing cruelty to birds. I don't want to chew up on your time on this, Your Honor. You can go back to the merits if you want. Thank you, Your Honor. I'd like to get back to the statutory command. Heckler's presumption of unreviewability of enforcement is inapplicable whether it's, quote, law to apply. And the Animal Welfare Act has that command, and it is law to apply in this case. As we stressed in our briefs, all application and enforcement of the Animal Welfare Act is predicated on the act of licensure, essentially three sections that work in concert. Section 2143 requires that the agency promulgate welfare standards and what topics those standards must address. Section 2134 mandates that dealers and exhibitors obtain those licenses. It requires the private entities to obtain those licenses. And Section 2133 ties those two requirements together by stating that the agency shall issue licenses once someone has applied for a license and once it has shown that they are in compliance with the welfare standards. The 2143 mandate was fulfilled decades ago. There are these general standards that apply general umbrella standards from animals as small as chipmunks to animals as large as elephants and include flying animals, including bats. And they're the most basic standards, Your Honor. They require access to clean water, access to food, that waste be removed from enclosures. Do any of these provisions require this to be done within any time limit? Well, they exist. I know they exist. But in explaining what the policy here is, as you've quoted, the policy on its face is we're not going to start enforcing until we get bird-specific regulations, correct? Correct. So it's not a, to use the Supreme Court's words, abdication in general of enforcement. It's a decision not to enforce until there are bird-specific regulations, right? Is that right? Well, there is no requirement in the statute to promulgate bird-specific standards. So when we brought it up. But nonetheless, their policy is not that we're never going to do this. Their policy is we're not going to do this until we have the regulations, right? Correct. And you are not challenging the either failure to issue those regulations or the delay, right? That's what you told me at the beginning. Correct, because the statute requires that they, the statute covers all animals who do not have species-specific standards. There are currently no species-specific standards. Right, and I'm focusing on the time frame. I'm assuming for the purpose of this discussion that I agree with you that they have an obligation at some point to issue, to enforce. But the only policy that you're attacking is a policy of postponing the enforcement until the completion of a set of regulations. Why isn't this governed by the Cutler case where that was exactly the issue and where the court seemingly held both that Cheney bars and that even if Cheney doesn't bar, it's not unreasonable to wait until you have specific regulations? I think the first answer to Your Honor's question is that Cutler v. Hazen decided on a motion for summary judgment. And the question of what the government is doing on bird-specific standards is a merits question. There's nothing in our complaint that alleges that they're working on bird-specific standards. But the question is what is the policy you're attacking? And you agree that the policy you're attacking is not enforcing until you, whether or not they're working on it, until you have them, until they have them, they're not going to enforce it. That's what they've said. So whether or not they're working on it, this is why I'm somewhat befuddled about why you haven't appealed the second question. If you had appealed the second question, you would have an argument about their delay, their intentional decision not to issue them, whatever. You'd have a track-like argument, which I don't understand why you're not making. But you're not making any of those arguments. The district court found that under SUA, if the statute doesn't command a timeline for them to carry out bird-specific standards, that when it's a self-imposed agency duty, that the agency can take all the time that they want. So below, on Claim 2, the agency said, Claim 1 fails because we have self-delegated this requirement to require bird-specific standards. So, you know, give us time. We're going to get to it. And Claim 2 fails because, well, it was self-delegated, so there can be no delay. We could wait 100 years because we gave ourselves this requirement. The district court ruled against you on both grounds. So the fact that the district court ruled against you on the second claim wasn't a reason not to appeal. There must be some tactical reason that I'm not understanding about why you're not appealing the second dismissal and are appealing the first. The reason is because Claim 1 gets relief to birds immediately. There are general standards. They can be easily applicable to birds. They are applicable to all sorts of other animals. But you agree there's no statutory requirement that they act immediately or that they act before they issue bird-specific regulations. There's nothing in the statute that says they have to do that. When Congress amended the statute to have birds specifically included as animals, it's now been 45 years that warm-blooded animals were covered under the statute. For decades, the agency said, even though birds are warm-blooded, we're not going to apply the act to them. When Congress stepped in in 2002 and said, include birds, rats, and mice under the statute, under the Acts of Protection, the agency within two years for rats and mice said, we're going to apply the general standards to birds and mice while we consider whether there are species-specific standards appropriate for those two animals. Perhaps two years was an adequate amount of time for the agency to say, okay, there's a statutory change. We are going to take action. For birds, it has now been 13 years. Our position is that when Congress changed the law in 2002 to say that birds are governed under the statute, at that point, the statute applied to them. The general welfare standards should be applied. Licenses need to be issued. Private individuals need to obtain licenses. And we didn't bring this case back in 2002 because we understand that the agency needs probably a little bit of time to get off the ground. But the general standards apply in this case. We filed an unreasonable delay claim after there has been, initially in 2005, they said specific standards were coming in 10 months. They've since 12 different times. But that's not before us now, right? No, but I think it informs the fact that the statute is not being applied as to the general standards, and licenses are not being issued. I'm trying to understand the difference between the unreasonable delay arguments that you are pressing now, just a generic across-the-board unreasonable delay in doing anything, is your point now? Yeah, an unreasonable delay in enforcing the Act for birds in any way. That argument does not encompass anything specific like a failure to promulgate regulations. No, it does not encompass anything like a failure to promulgate regulations. The regulations exist. The regulations are there. They are general standards that apply to all animals who do not have specific standards. There are currently no specific standards for birds. As with rats and mice, once Congress said include these three. So I'm trying to understand from your reply brief, is your argument that it's unreasonable delay because until they get the specific ones, they should at least apply the general ones? Absolutely. Our position is that the general standards apply. The general standards exist, and they need to be applied. It's unreasonable delay in not making or issuing a decision that says we'll do the general ones until we get out. We're not asking for any decision, Your Honor. There are general standards that apply to all animals. There's 45 years of agency. After the prior NPRM, they'd have to make some sort of statement that says, never mind, we think the general stuff is good enough for the interim. Wouldn't they have to say something? They may have to say, yes, while we consider birds, as they did with rats and mice, while we consider bird-specific standards, we will apply the general standards. I have just a fact question. How many, I would think a number of animal facilities would have both birds and other animals that are covered by the AWA. And so what am I wrong? Is there a huge body of entities, potentially regulated entities, that only have birds that in your view need to be covered? Or is part of the problem that the Secretary is actually enforcing the law against every part of the zoo except the aviary? The latter, Your Honor. We have, in the record there, the case of a zoo that had many different types of animals, where feral dogs got in and tore apart flamingos while they were alive. I saw your examples. Is that the bulk of where birds are? Or is there just one more? I just don't know enough. I haven't gotten an administrative record yet in this case, Your Honor. I don't know. I thought as PETA you might have a sense of where these birds are that are being injured in this tree. My sense is that most of these facilities exhibit other animals already, and so it certainly wouldn't be a great burden on the agency to not just throw up its hands and say, well, birds aren't regulated, wild dogs can come in and maul them, or we can allow 500 parakeets to starve to death, as the examples in our briefs. Other questions from the bench? Thank you. Thank you, Your Honor. May it please the Court, Will Haffman on behalf of the U.S. Department of Agriculture. As PETA acknowledges, PETA no longer alleges the agency has unreasonably delayed promulgating bird-specific regulations. PETA raised that argument below. The district court rejected it, and it has not pressed that argument on it. Can I tell you something about the coverage of birds, just to clarify? Is it your view that Chevron Step 1 makes birds covered since the amendment by Congress that had the exception for once raised in research facilities, or is it a Chevron Step 2 perfectly sensible construction of that exception, that in fact they are then regulated in the body of the Act? The agency hasn't taken a formal position on that, Your Honor. I think that there could be an interpretation of the Act that would exclude birds, since it's actually an exclusion of birds not bred for use in research, rather than an inclusion of birds that are not bred for use in research. The agency interprets the amendment to include birds not bred for use in research into the Act, regardless of whether it's Step 1 or Step 2. That is the interpretation that the agency has made. Does that answer your question? If it was Step 2, then the next question would be, does that mean that you would then, because it's Step 2, in the course of deciding whether they're covered, you might have more discretion in deciding how they're covered, and differential treatment between them and other animals might be more readily justified than if it was deemed to be a mandatory coverage on the same terms as every other animal? I see, Your Honor. I think that the agency interpreted the 2002 amendments from the outset to include birds not bred for use in research. Has anyone ever applied for a license for birds? The record does not contain that information, Your Honor. The record of this case? The record of this case does not. Does your client know? I think that there is an informal understanding between the agency and between facilities that deal or licensing birds that, on a temporary basis, those facilities need not apply for licenses. How did that understanding come to be? There is an informal notice on the agency's website. What makes that informal rather than formal? It's on the agency's website. Everybody knows. You know. Everybody knows. Don't worry if this law doesn't apply to you for now, and that for now has stretched to a decade. Well, the policy on its face says that it's intended for guidance only, but Your Honor is right that there is an understanding between regulated parties and the agency, but for the time being, as the agency determines. Why isn't something like that evidence of a policy of non-enforcement? Well, Your Honor, this Court in Crowley articulated the standard that's required to show a reviewable policy as either being something that's gone through notice of common rulemaking or something akin to a universal policy statement. That is a rule. And here the District Court found that. A formal pronouncement by the Secretary of Agriculture, I have decided that we will not regulate birds. It doesn't count? I think that the District Court was right that that does not count. But even if the Court believes that that's incorrect, even if this Court thinks that that's enough to give rise to the policy. Why wouldn't that count? It sounds like a final agency action. It sounds like a formal statement of position. Well, the agency is not published in the Federal Register. The agency can change its mind. It's not sufficiently formalized. Well, agencies can change their minds even when things are published in the Federal Register. I'm not sure that's much of a metric. Your Honor, even if you conclude that the District Court is wrong, that this is sufficiently formal to qualify as a reviewable policy, you still run into the Cutler case and the Association of the Irrigated Residents case, where the agency action in that case, the agency policies in those cases were more formalized, more generally accepted and understanded by the parties than the policy at issue would be. I can't imagine what's more generally accepted than we know, everybody knows, see the website. Well, in Cutler v. Hayes, Your Honor, page 882 of that opinion, the Court said that FDCA made clear that it will not presently take enforcement action against an over-the-counter driver. How long was the presently there? How long had presently gone on for? Presently was 25 years in that case. The FDCA was amended in 1962, and that case was decided in 1987. And when did the statement come out from the agency? When did the statement come out? In that case, it was... The presently statement that you were quoting. In that case, it was a policy whereby the agency was deferring bringing enforcement actions against ineffective over-the-counter drugs. Just say again, the page site for Cutler where you were reading from? That's page 882 of Cutler. And so in that case, the agency had made clear, as the Court identified in Cutler, that it was not going to take enforcement actions against safe but ineffective over-the-counter drugs until it had completed a comprehensive study. All right, but I'm confusing two different things. I thought you were citing this for the proposition that it didn't... Cutler says this is not enough to have a policy. Is that what you're saying? I think that under this Court's subsequent precedent, it talks about whether a policy is sufficiently formal and universally repealable. I thought you were citing Cutler for this proposition. That's right, Your Honor. But Cutler takes it as a given that the FDA has a policy of postponing enforcement. I think that it uses the term policy, but I think that it uses the term policy in a different way. Where does it say that it's not concrete enough to be considered as a policy under change? The point of Cutler, Your Honor, is that although there was a... I know you won in Cutler, and maybe you'll win as a result here, but I'm only on this one particular question, which I'm also having difficulty with. In Adams v. Richardson, there was no policy of not enforcing the anti-segregation rules. There was no official policy. The Court just found that the agency just wasn't doing it. Here it seems just like in Cutler. You have an announcement that you are not going to enforce the rules pending... You're not going to enforce anything with respect to birds pending the issuance of bird-specific regulations. That seems to be enough to have a policy. Now, whether it's a policy that's an exception to Cheney v. Heckler, Heckler v. Cheney is a different matter. That's right, Your Honor. Do you agree with me then? Yes, I'm with you. My response to Judge Millett's question was that even if this Court concludes that the district court was wrong, that is, that there is something that's sufficiently concrete to qualify as a policy, you still run into the problem of Cutler v. Hayes, which shows that nevertheless it's subject to the Heckler v. Cheney presumption of unreviewability because this is just a temporary decision by an agency not to bring enforcement actions as it figures out how to accommodate a rather complicated change. So then you agree the district court was wrong on this one point that we were starting talking about, on the concreteness question. I don't think that the district court was wrong. I think that the district court had a sound basis for concluding that this was insufficiently concrete, insufficiently universal to qualify as a policy. But even if this Court concludes that the district court was wrong, it is still unreviewable under Heckler v. Cheney. Can I just add a universality question? Sometimes the government has to give something up, and I'm trying to figure out why you're not willing to give this up. It is the government's policy, is it not, universally not to enforce with respect to birds until you have a bird-specific regulation. Until we have a bird-specific regulation. So that is a policy. And that's published in the Federal Register. Universal, et cetera, right? It satisfies the whatever you think there is with respect to concreteness and universality. It doesn't satisfy anything with respect to temporality.  That is time. That's correct, Your Honor. Are there any limits on temporality? Time. Temporal. Temporalness. Are there any limits on how long this can go on? I think that there are limits. I think that the agency has not come close to those limits. In this case, I again point you to our agency. Can you give me a sense of what the limits would be? Pardon? What's your sense of what the limits would be? I think it would depend on the facts of the case. Right. So the facts of this case. And the facts of this case, I can't point, Your Honor, to a specific time that would be too long. I think that as long as the court is satisfied that the agency is working on developing bird-specific regulation, then it is certainly within the agency's discretion not to enforce the general regulations with respect to birds. And is it within their discretion not to when they have another existing set of general regulations already there, already being applied to the exact same institutions? Is there any obligation to provide reason, explanation as to why those should not be a stopgap measure? Well – When you know that – I mean, I don't think you dispute that harms are occurring daily. We don't dispute the facts in the record with respect to the specific instances of harmed birds that have been identified. However, there are very good reasons not to apply the general animal welfare standards to birds, and these are actually reasons that PETA itself noted in a comment in 2004. What's wrong with give them water every day, feed them every day, clean out the enclosure? In addition to those types – in addition to those regulations that you specified, the general regulations also deal with inspections, and they deal with the manner in which – No, I got that. But it seems to me that the agency has a list of regulations here, and if it says, all right, part A, that's great. Every animal is covered. It should get fed, watered, and a clean place to live. As to part B, which deals with expenses or other aspects that are more complicated, that's put aside. But you do have a situation here where it's not just we haven't gotten around, we need time to do complicated regulations. You've made a specific determination not to apply the most basic general requirements, even though you have admitted that this statute applies to those animals, and this has gone on for a decade. It seems to me a very more complicated picture. There are good reasons, Your Honor, not to apply the general animal standards to birds. All of them or any of them? Well, it is within the agency's discretion to decide that as a blanket measure it's not going to apply any of the general standards to birds because many of them, some of them, may either just be inappropriate with respect to birds, may be unclear with how they apply to birds, and may affirmatively harm birds. Birds are the only animals that lay eggs that are subject to the Animal Welfare Act. All of the other animals that are governed by the general animal standards do not lay eggs, and birds may crush their eggs when they are approached by strangers. And this is a problem with respect to applying the general animal standards to birds because the general animal standards call for routine inspections. They call for strangers to approach eggs that may be nesting, and birds may harm their eggs as a consequence. Also, birds are among the only animals covered under the Act that are subject to zoonotic diseases, that is, diseases that can be transferred from animals to you, and that also raises a complication and a potential danger of applying the general animal standards to birds. And so given these problems... And so for 10 years you can't figure out that they should at least be fed, watered, and maybe even take out clean if you don't want that fed and watered? It is within the agency's discretion, Your Honor, to decide not to apply the general animal standards generally as a blanket matter as it determines what specific standards should apply, rather than trying to determine which provisions of the general standards ought to apply and which wouldn't, which may in fact... This question of whether it's within the agency's discretion goes to the question of whether the agency is arbitrary and capricious in acting, correct? I take it there's no arbitrary and capricious claim in this complaint. The nature of the plaintiff's complaint here is agency action unlawfully withheld. That's right. Is that right? So the question really, if we were to get to the merits, is not whether the agency is acting reasonably or not. The question is whether the agency is compelled by something in the statute to do a particular act, as the Supreme Court says, a discreet act, within, in this case, a particular length of time. Am I at least putting the issue correctly? I believe, Your Honor, I was putting the issue correctly. And this case is squarely governed by the presumption that was announced in Heckler v. Chaney that agency non-enforcement decisions are presumptively immune from judicial review. And the only way that a plaintiff can overcome that presumption is if they can either show a complete abdication, which PETA cannot show here, or if they can point to something in the statute that requires the agency to take a specific enforcement action that constrains the agency. Well, we never even held that a complete abdication would be enough, and neither has the Supreme Court. Everyone's always said that's a possible exception. We've never been able to find a case where there actually was an abdication. That's right. The Court has never found a case where there was an abdication. However, I believe that in the Drake case, this Court articulated a complete abdication as an exception to the Supreme Court. Well, we've said many times that, but we've never had the holding on the subject. That's correct. The Court has never, since Adams v. Richardson, the Court has never found a complete abdication of the statute. What's the difference between, would it not be, what would be the difference between, from your point of view, between the question of whether it's barred by Heckler v. Chaney because it's committed to agency discretion, or assuming that it's not barred, but concluding that it's not compelled by the statute, and therefore there's no cause of action? What's the, well, I guess they're both cause of action questions. What's the difference between holding that it's committed to agency discretion and holding that even if it's not committed to agency discretion, there's no agency action unlawfully withheld? I think that there's substantial overlap in the inquiries. I think that the inquiry that is contemplated by Heckler v. Chaney is quite similar to the inquiry that's contemplated under the Supreme Court's case in Southern Utah Wilderness Alliance, but I think that perhaps the main difference is just in the procedure. This is, Heckler v. Chaney is a presumption of unreviewability, so it does not even get into the merits of the case. It does not get into the statute. But it's not, it's not jurisdictional, so we can skip that if we want to and go directly to the second question, and I'm trying to figure out what's the difference, whether we address it at the reviewability stage or we address it at the unlawfully withheld stage. I think that either option is available to the Court, and I do want to point out that although PETA in its reply brief says that the government did not raise the alternative basis for affirmance below, that is simply incorrect. We did argue that basis for dismissal in district court, and we cited the Southern Utah case no less than eight times in our motion to dismiss or in the alternative summary of judgments in that case. But if, I know that my time is up, but if I could briefly address the standing question that Judge Millett was addressing at the outset. That would be great, and if you're doing so, could say how you think you can wiggle out of Action Alliance and Appagale Alliance. Sure, Your Honor. I'll address those cases first. I assume you don't take the premise that you'd have to wiggle. I will try not to wiggle, Your Honor. So this Court's test with respect to organizational standing is a two-prong test. The first prong of that test requires a plaintiff organization to show a direct and cognizable injury to its mission as a result of the defendant's conduct. And PETA cannot show such a direct and cognizable injury. And although it is true that Action Alliance and the Appagale Alliance case do involve allegations of harm by organizations that flow through third parties, as Judge Millett noted, those were cases where the agency was exercising its coercive power over third parties. It was making, it was altering the third party's legal rights or obligations in such a way as to prohibit them or authorize them to do the thing that the plaintiff organization in that case complained of. And that is not the case here. These are non-enforcement decisions. These are decisions temporarily by the agency not to exercise its enforcement discretion. And therefore, any choice by third parties to harm birds or to do the things that PETA complains of is an independent choice that is not traceable to the harm that PETA or to the conduct of the agency. But they would say, you've agreed you need to regulate birds. And if you regulate birds, you would, if you were doing the regulating you're supposed to be doing, you would be outlining these very activities that are killing birds and they're having to spend the resources cleaning up the consequences of your implicit authorization that this stuff can go on as long, we know they're supposed to be regulated, we're supposed to stop this kind of stuff, we're going to let it keep going on until we get around to writing our regulations and they're cleaning up the mess in the interim. I think that that is what they would argue and I think that that is their best argument, but I nevertheless think that it is insufficient to show the kind of direct harm that is required. And it would go further. This court would be going further than either the court in actuality. Just please help explain this to me. How is it less direct than the prior cases when they say we're having to spend resources, educating people, countering the message, advocating with you or with other organizations for the proper treatment we're having to do all the work that at least half, if not all the work that you would be doing. And they're spending the resources. How is their resource expenditure less direct? Well, the question of resource expenditure is part of the second element of this court's organizational planning test. The first part of the test, however, requires the showing of direct harm. And in Abigail Alliance, the direct harm that was caused by FDA to the plaintiff organization was the FDA was prohibiting third-party drug manufacturers from releasing the drugs that the plaintiffs wanted released. So there is a direct prohibition of conduct that the plaintiff organization wanted to be authorized and be legal. So too with the Action Alliance case. That was sort of an informational injury case, but that was a case where the agency explicitly authorized the thing that the plaintiff complained of, and here there's no such explicit authorization. I'm not sure. I thought in Action Alliance it was the elimination of a requirement to self-evaluate. That's correct, Your Honor. Well, that is taking away, not enforcing against the third party the requirement of self-evaluation. The harm that was complained of in Action Alliance was an informational injury. Yes, but nonetheless, it's information from a third party. Information from a third party. But in that case, the plaintiffs could point to a legal requirement that they claimed applied to the government to release the information that they sought. And as Judge Millett pointed out here, there's no such legal requirement here. And I think that that is an important point. If PETA were an individual rather than an organization, both of the harms that this report found, that is the informational harm and the sort of procedural harm that PETA can't petition the government to take inspection actions, would not be cognizable injuries under this court's precedent because both depend on the conferral of a statutory right, a statutory right either to information that the plaintiff is deprived of or to the procedure that the plaintiff wants to take advantage of. And it cannot be that PETA can establish an article-free injury just by virtue of the fact that it happens to be an organization. Why is the Action Alliance quite similar, though, in the sense that you have a backdrop of regulations that creates information just like the general regulations that HHS had there? And then via your NPRM, you have yanked back the ability to have that type of information. You've cut it off. You've dammed it off as to, or it's not going to exist by virtue of what you said in the NPRM. Those things aren't going to apply to them. And so I understand it wasn't already flowing and stopped, but as soon as you said these birds are covered by the statutory scheme, they could argue that they're entitled to that flow, and then you said, uh-uh, no, we're cutting it off as to that. But they are not entitled to that flow, and that's the key distinguishing factor between this case and Action Alliance. In Action Alliance, there were these regulations. Is there a statutory right or regulatory right to information in Action Alliance? In Action Alliance, I believe it was a regulatory right, but it nevertheless was a regulatory right, and there is no such regulatory right here. There's no regulatory obligation imposed on the agency to publish the inspection report. How is the regulatory right articulated in Action Alliance? Was it that you have an obligation to make these reports and make them publicly available? Your Honor, I'm not familiar enough with the details of that case. However, I think that it was uncontested in that case that such a regulatory obligation existed, or at least that was the claim to honor that the plaintiffs alleged. And they said that if you were doing what you should be doing, we would, as a direct result, get the information that we want. And that was the entry that was found there, and there's no comparable allegation here. Do your general regulations require institutions to file information that would be available to them, or is it simply information you would create if you were enforcing the act that they want? It is information that we would create. There's no obligation on the agency to publish its inspection reports or to make them public. And the entities file information with you for those inspection reports? They are made available online, as a matter of fact. The entities' reports are made online? And so I was trying to figure out, entities provide information to you, I assume, as part of the inspection process. I assume maybe I'm wrong, and then you have your own inspection reports. Is it both of those that are publicly available, or is it only your actions? I want to be clear that there are two things at issue here. One is whether the ultimate inspection report is required to be published online or what the source of that is. And the ultimate inspection report that the agency produces, there's no requirement anywhere in the regulations to do so. However, there is a different provision of the regulations, not the statute, but the regulations, that requires USDA to publish a list of just licensed facilities. But that is not the harm that this report found here. It's not the harm that PETA complained of here. What PETA complained of was they were deprived of the actual ultimate inspection reports. And so even if this Court agrees that there is some kind of licensing obligation, that in a sense wouldn't even redress the harm that PETA alleged, because all of the harm that PETA alleged deals with these inspection reports and their ability to petition the agency to conduct an inspection. It does not deal with the predicate of licensure. Why does it matter whether the agency is compelled to disclose the inspection reports or not? They do disclose them now with respect to non-BIRGs, don't they? That's correct. So why should it make any difference? Well, it makes a difference under this Court's precedent and under the Supreme Court's precedent. Well, have we ever held that that is the distinction in these associational standing cases? In an organizational standing case in Feld, Your Honor, the Court first looked to the alleged informational injury and then turned to what the Court called a Havens-type injury. And in first looking at the informational injury, the Court said that a way that a plaintiff can establish an informational injury is by alleging a statutory entitlement to the information that they were deprived of. And that mirrors the Supreme Court's language in the Aikens case, where they found that the plaintiff in Aikens was harmed, but only because the statute issued there, the Federal Election and Campaign Act, that we entitled the plaintiff to the information that they complained of. And there's no such statutory entitlement. Does the statute even require inspections? Does it require reports? No, Your Honor. If there are no further questions, we ask that you either affirm or, in the alternative, vacate and remand with instructions Thank you. Your Honor, I'd like to bring this back to the procedural posture of this case for a moment. Before you do that, could you go a little further on the standing? Besides the informational injury, what is your other injury, Havens-like injury? The other injury is that, as a matter of policy, the USDA investigates complaints that is made to them and makes inspection reports available in response to those complaints. But for the policy not to regulate birds, the agency would follow up on those complaints and address bird cruelty directly, just by citing the violators, demanding remedial actions. So PETA is also injured in the fact, its mission is injured in the sense that it cannot go through the normal policy of submitting complaints, and then it must spend resources to try to find alternative means, which are often inadequate, including... But you're supposed to demonstrate a direct conflict between them and you. So in the Feld case, it was said the way elephants are treated is bad, and the circus folks say it's perfectly fine, which is simply disagreeing at walker heads, I think was the word, on the issue. And in Havens, it was equal access to housing, discriminatory behavior, and disclosure of information about housing that's available at loggerheads. How are you at loggerheads? It's not that they're saying it's fine to mistreat animals. In fact, they said they're covered and we need to regulate them. We just don't have it yet. In the meantime, your argument, I take it, is we have to fill in the gap. How is that a direct type of conflict at issue in Havens or Feld or any other precedent? The question of whether the government is causing the injury to PETA is an issue of causation. It appears that the government is trying to read in a second sub-causation prong into the injury prong. But the causation issue is settled firmly by this Court's en bloc decision in ALDF v. Glickman. There, the plaintiffs said these roadside zoos should have, sorry, the AWA should require better protection and enrichment for the chimpanzees at these roadside zoos or these primates at these roadside zoos. And if the USDA interpreted the statute in the way that I allege that they should apply the statute, that would ameliorate the problem by these third parties. Hadn't they authorized the conduct there? Excuse me? Had they just not done anything or had they authorized the conduct that was at issue in Glickman? Well, it depends on how you characterize it. How did the opinion characterize it? They had promulgated the allegations, which is what the Court was looking at in the Alambanca opinion. Looked at the question of whether the allegation was that the statute, if enforced the proper way, in the way that the plaintiff alleged that it should be enforced. But what had the government done there that was wrong? Just not regulate at all or authorized something to happen that was harmful to animals? Inadequate regulations as to what the statute required. So it could be sort of half a one or half a dozen. They issued regulations. They said, here's our regulations. We think this is enough. And in your view, they were inadequate. That's right. And here we have absolutely no... So they had to authorize. In saying they think this is enough, that's authorizing the behavior. Well, here they're saying we think nothing is enough. No, I don't think they said that at all. That's the problem. You don't have the loggerheads. They haven't said nothing is enough. They said we need regulations. We just haven't got there yet. We don't have them yet. And you've abandoned that challenge. We've abandoned the challenge to the specific standards because nothing in the statute requires specific standards. No, you've abandoned the challenge. I thought you said you've abandoned the challenge as to the failure to promulgate the regulations that they promised were coming. Well, the statute requires standards generally. The agency has the discretion to have specific standards as to some animals. And they do have specific standards as to cats, non-human primates, marine mammals. But the statute requires standards. Standards exist for everyone. For all the animals who do not have specific standards, the general standards apply. Is it your view that it's Chevron step one or two on the bird coverage? Well, for one, this Court in Cook said that it's unclear whether this circuit applies to Chevron in the non-enforcement context. But I think, no, I think. I'm just asking as an interpretive question of how birds are covered. Sure. I think it's a Chevron step one question. The statute says apply licenses. With those licenses, make sure that before you apply the license, before you grant the licenses, ensure that the licensee is in compliance with the 2143 standards. The 2143 standards exist, and they've existed for decades. They've existed since the animals, since the Act applied to all warm-blooded animals in 1970, when birds first should have been given these protections 45 years ago. But instead, the agency first says for 30-some-odd years, we don't believe birds are warm-blooded, and then they said, you know, we're just not going to apply the general standards to birds while we sit on our hands and deal with these bird-specific standards, which since 2013 haven't even made any sort of regulatory pronouncements. There's no timetables. Again, these are proposed regulations. They could still, once proposed, take years to be final. If I could make a quick point, Your Honor, about the procedural posture of this case. The government here was arguing about the record in this case and what it reflects, said that whether the delay is unreasonable would depend on the facts of the case. There is no record in this case, Your Honors. We have not gotten out of the gate. We have not been provided the opportunity to have the administrative record to show that the delay is unreasonable. But if on remand the government, on summary judgment, wants to say the delay is reasonable for these variety of reasons based on the record, we're happy to have that argument. A couple points about Aaron, the association of irritated residents in the Cutler case. The Cutler case came to this court on a motion for summary judgment. There was an administrative record. They were able to show what happened. Ayer came to this court on a petition for review of final agency action where there was also already an administrative record produced. But the question of both Ayer and Cutler was whether the statute applied at all. In Ayer, it was certain environmental statutes that were triggered by the level of admissions, and the agency didn't know how to measure emissions from animal feeding operations. So they entered into non-prosecution agreements with the feeding operations that said, pay a small civil penalty, so there was some enforcement. Pay a small civil penalty, allow us access to your facilities, and help us fund the study to figure out how we can measure these admissions. And this court said, while you figure out whether the statute applies, that you can sort of take as much time to make that predicate determination. Same with Cutler. The question was whether the drugs were safe and effective, and the FDA was taking its time to figure out whether or not the drugs, certain over-the-counter drugs, were safe and effective. The court came on a motion for summary judgment after the record had been produced. Here, the agency knows what a bird is. It knows that the statute applies. There's no question about the scope of the statute or to what extent the regulated entity here, birds, should be provided protection. These animals have waited 45 years for protections, Your Honor. I ask that the court reverse and remand. I've got a question. We have a question. This is not on this case, but I know your organization has a broad portfolio, but I was listening recently to a man describe his childhood in which his father took them every summer to Mexico, captured hundreds of cockatoos, brought them back in burlap bags, and sold them and so forth. Is that still a problem? I'm just thinking about the increased border security. I suppose now people could take the birds from further down Central America. Do you all watch that at all? Your Honor, when it comes to sort of important export of exotic and wild animals, PETA is heavily involved. As to the question of is the problem of the birds being smuggled in from Mexico and South America still an issue, I honestly don't have an answer for you. Thank you. We'll take the matter under submission. Thank you. Give us a brief adjournment. Let me give us an adjournment.
judges: Garland, Henderson, Millett